Good morning, ladies and gentlemen. Our first case for argument this morning is United States v. Zambrano. Mr. Herbert. Good morning. May it please the court. My name is Dan Herbert, and I'm here on behalf of my client, Fernando Zambrano. And what brings us here today, your honors, is an appeal of a conviction which occurred in August 2022 against my client, Mr. Zambrano, for one count of providing false statements to the federal government. The counts, or the one count, were false statements, and the evidence clearly showed they were vague answers to vague questions. But nonetheless, that was a conviction of my client, who was a decorated police officer with absolutely no criminal background, a father, and he has already served his time here. We're going to ask, because of the significant errors that occurred at trial, before trial, and newly discovered evidence after trial, that the conviction be vacated. And I also will ask that I be allowed some time for rebuttal in this case. The issues, your honors, which bring us here are the errors at trial, which was a prosecutorial misconduct, suppressing favorable evidence to the defendant regarding the conviction. While seeing prosecutorial misconduct being a theory in your brief, I thought you were making just a new trial, new impeaching evidence argument. Yes, your honor, but it was based upon the prosecution's suppression of the favorable evidence regarding the key witness in this case, Agent Chesla. Did I miss the arguments about prosecutorial misconduct? They're in there, your honor. I apologize. That's okay. So it's the prosecutorial misconduct regarding the... You're saying there was deliberate prosecutorial misconduct. Yes, your honor. Okay. And that's based upon the fact that we discovered evidence after the trial about the misconduct of Agent Chesla in a similar case in which he was found to have committed a perjury and obstructed justice. This information was known to the government at all times during the case involving Zimbrano. Now, I will acknowledge that... When did Judge Connelly make his findings? He made it after the verdict in our case. So in what sense is this prosecutorial misconduct? Because the government was aware of the misconduct that Chesla committed, and it wasn't... They didn't need the judge to tell them that there was misconduct in this case. The misconduct was committed by Chesla against various government agencies. He was providing benefits and withholding evidence from the Immigration Department, the ICE Department regarding witnesses. And the prosecutors in this case knew about it? Judge, my position is that they had to have known about this. I don't have any direct... These are serious accusations, and it sounds like you have no evidence to back them up other than speculation about timing. Well, Your Honor, with respect, there was no way that the government could not have known about the misconduct of Chesla because it was a situation where it was heavily litigated in the same courtroom... I'm sorry, the same courthouse, and they were very serious accusations. And in the case with Mr. Zambrano, there's no question that Chesla was the star witness in this case. So the evidence, it proves how much of an integral witness Mr. Chesla was. He was called three different times in this case by the government. So, no, I do not have direct evidence that the prosecutors in this case had direct knowledge of it. But I am saying that it's reasonable to infer that they should have had knowledge about this. Does the record reveal how many cases witness Chesla was on besides Zambrano and Decoleta? No, Your Honor, I don't believe that there was ever any evidence presented about the number of cases that he had. Were you present at the Decoleta seven-day evidentiary hearing before Judge Connelly? I was not, Your Honor. Do we have any understanding of how much time Mr. Chesla spent on the stand at that seven-day evidentiary hearing? Your Honor, I don't know the answer to that question, but I know that there was vigorous cross-examination, as mentioned by Judge Connelly in his ruling. And I'll be honest, my only knowledge about the Decoleta case is what I saw in Judge Connelly's ruling. Otherwise, I don't have any knowledge about that case. Okay. Aside from the Chesla issue, which we believe is the main issue here, we also take issue with the materiality instruction that was given by the court in this case at the close of evidence. And I'll explain why I believe that was prejudicial, it shouldn't have happened. And then the final issue is the court's response to various jury notes. As Your Honors know, it's integral to the Bedrock Foundation that a defendant receive a fair and impartial trial. And in this case, the consequences are not just an injustice to Fernandez and Brano, but it can be an injustice to all Americans. Mr. Herbert, is there any – I understand, I think, at least your attack on Chesla, regardless of what prosecutors may or may not have known when about it. But as I understand it, the critical evidence here was all on tape. Is there any dispute as to whether Mr. Zambrano called, I guess it was Mr. Reccio, three times on three days about his contacts from the FBI? There is no dispute about that. Is there any dispute that Mr. Zambrano wanted to know what the FBI was asking Reccio? There is no dispute about that. And is there any dispute that Reccio was told by the defendant he did not have to talk to the FBI? There is no dispute about that. Nor is there any dispute that the defendant lied about his contacts with Reccio when he was interviewed by both Chesla and Weller, correct? I would agree that he gave false statements, but obviously— Given all of that, why is it – I guess I'm having trouble understanding how critical Chesla's credibility was in this, since Weller also could have testified in his stead and also testified. Your Honor, the tapes alone in this case obviously were powerful evidence to show that Mr. Zambrano gave a false statement. There's no question about that. However, what was required to be proven was not just a false statement, but that the false statements were given willingly and they were material to the investigation. And the biggest point that we have pointed out and shown is that Mr. Zambrano's false statements were not material to the investigation that was his conduct. That's on the theory that the agents didn't believe him? No, it's under the theory that there was no $50,000 investigation at the time in which Mr. Zambrano was interrogated, which was the date of his false statements. So if there was no – the government tied this – they tied this case to a false statement that had the potential to impede an investigation into the unaccounted for missing $50,000. The phone calls do not mention anything about the unaccounted $50,000. So what? There was no investigation regarding the $50,000 unaccounted for money at the time of Mr. Zambrano's interrogation, which means – So why was he being questioned? He was being questioned just like all – every agent in his unit because there was a criminal case that was being formed against this individual named Sabini. Right. So his – who his partner, right? Zambrano's partner. One of his co-workers. One of his co-workers, yes. So how crystalline in form does the target of the investigation have to be in order for interrogations as part of it to be material? Well, there was no investigation. Is my point in your honor? There was an interrogation. There was an interrogation. There was an inquiry, right, into members of this task force? It was into various deals, you know, consignment deals and drug deals, yes, pertaining to – I guess I'm having trouble understanding the theory behind your materiality argument. I'll try and make it more clear. The government was required to prove that the statements were material to the investigation concerning the unaccounted for missing $50,000. That's how the indictment was drafted. It was not – it was not material to an investigation into Sabini. It was not material to an investigation into any other matters. It was material to the investigation into the missing $50,000. And Chesla is the only person that could provide the link to that investigation being active as of the date of the interrogation. And that's exactly how the jury instruction read was that if you find that the statements were false and there was an investigation as of that date, you can find him guilty. And important in this case, I think, your honors, is that it's likely that this case would not have even gone to a jury had defendant been allowed to – or had defendant known about the misconduct of Chesla. In this case, as your honors know, there was significant pretrial motions done in this case. Rather unique, there was two motions to dismiss – I think it's unique anyways – filed prior to trial. Both of those were based on the misconduct of Chesla. This was all done prior to knowing about the significant impeachment and perjury and obstruction of justice. Chesla was the link to this missing $50,000 investigation. Nobody else, despite what the government says, but Chesla essentially created this $50,000 issue. He was the one that pulled the ROI, the investigative form. He provided the link for the email from Agent Hire that cast some suspicion based upon some innocuous statements. Chesla was the one that testified to the jury that he spoke to Ressio about the $50,000. That's important because, again, the government had to prove that the interrogation of Zabrano, there was an active investigation. Ressio didn't testify. Chesla said, oh no, I talked to Ressio about the $50,000. There was no mention of it. If you wish to reserve any time for rebuttal, now would be a good time. Thank you, your honor. Ms. Alexakis. Good morning. May it please the court. Georgia Alexakis representing the United States. The district court did not abuse its discretion here in denying defendants motion for a new trial. The defendants motion for a new trial was premised in part on adverse credibility determinations that were made more than a year after the jury trial here against case agent Tony Chesla in a separate, unrelated criminal proceeding involving a different defendant, Robert Dekulaita. There were no findings that agent Chesla committed perjury. There were no findings that agent Chesla committed an obstruction of justice. A jury cannot commit error by failing to consider evidence, in particular these adverse credibility determinations, that did not exist at the time of trial, and the government cannot suppress evidence that did not exist at that time either. With respect to the defendants motion for a new trial and its premise that allegations made against agent Chesla with respect to the Dekulaita matter should have been disclosed, those allegations were made before the defendants trial in this case. But as the district court concluded, ample evidence at the defendants trial established his guilt, in particular that his false statements to federal agents were both willful and material, and that evidence, as Judge Hamilton said, was all on tape. That critical evidence was all on tape. It was separate and apart from any testimony provided against the defendant by Tony Chesla. In particular, the evidence establishing that Fernando Zambrano's lies were willful, were again his own words as caught on tape, both in conversations with the source, Juan Recio, who recorded those conversations not at the direction of law enforcement, as well as in the recorded statements that he made during his April 2019 interview with Tony Chesla and Agent Weller. The juxtaposition of those recordings reflected Zambrano's lies. In addition, the jury heard testimony from a supervisor, Morrow, who testified with respect to the defendants knowledge of the investigation, the fact that throughout 2018 Zambrano would have been put on notice of the investigation based on the dismissal of one of his cases with Agent Sabini, the fact that Agent Sabini was placed on administrative duty, and the fact that as Agent Morrow testified or Supervisor Morrow testified, by early 2019 the investigation was, quote, common knowledge. The jury also heard testimony from Supervisor Heyer, who's the individual who looked at the reports for the January 2017 drug deal in question. He looked at that in January of 2019, and that's the notification, the fact that Supervisor Heyer looked at those reports is what then set into motion a chain of events in which Zambrano then emails with Agent Sabini to discuss the import of the fact that someone outside their chain of command is looking at that investigation. So all of this, in addition to the fact that Zambrano himself is a law enforcement agent who would have known that lying to federal law enforcement is a federal crime, and the fact that Zambrano was warned about the fact that there was an investigation into his criminal misconduct before his April 2019 interview, all of that speaks to the willfulness behind Zambrano's lies to the agents in April 2019, and all of that is separate and apart from any evidence provided by Tony Chesley. Ms. Alexakis, can you clarify for us what we're being told by your colleague is that, at least as I understand it, the investigation alleged in the indictment had not yet taken shape at the time of the April 4th interview? And I disagree with that representation, Judge Hamilton. I think the indictment alleges that there was an investigation into criminal violations by Fernando Zambrano and Agent Sabini, anonymized in the indictment, and then it specifically states, the indictment goes on to specifically state that the investigation encompassed an investigation into the unaccounted for $50,000. At trial, the jury heard from Agent Heyer, or Supervisor Heyer, who testified that in January of 2019, so three months before Fernando Zambrano was interviewed, he pulled the relevant documents regarding the January 2017 drug deal that is related to the unaccounted for $50,000. So that's one piece of evidence untethered to Agent Chesley that establishes that the $50,000 was within the scope of the investigation before Mr. Zambrano was interviewed. Another piece of evidence going to that point is the fact that Agent Weller testified that in March 2019, so one month before Mr. Zambrano was interviewed by agents, agents Chesley and Weller showed Juan Recio the $50,000 transaction receipt, so the receipt that purported to show that Recio received $50,000 from Agent Sabini and Officers Zambrano for the January 2017 heroin deal. Now, I will say that Agent Weller's testimony was hamstrung by the lack of fluency that he had in the Spanish language, so he could not then testify without violating hearsay rules as to what Recio said in response to being shown the transaction receipt. Yet, Weller was able to testify that the transaction receipt was shown to Recio, therefore further establishing that that $50,000 transaction was within the scope of the investigation before Mr. Zambrano was interviewed. Inquiring minds want to know, have you all found the missing $50,000? There's nothing in the record to reflect whether the $50,000 has been accounted for. One of the arguments that you all make in your brief is, in essence, that impeaching evidence cannot support a new trial, and I wonder if that is not too broad and too categorical, as we've suggested in a case called Taglia, 922 F. 2nd at 416, and it's also hard to reconcile that kind of categorical rule, at least for me, with the broader Brady-Giglio line of cases. Yeah, and I think stated that way, it does strike me as too categorical as well. I think that there is language in the case law that talks about how impeaching evidence can be material in cases where a particular witness is testifying. Language in the case law, that's the holding of United States against Amherst. Yes, Judge. Yes, so I guess the way I would put the rule is, typically, usually, impeaching evidence cannot be the basis for a new trial, unless you have a situation in which a particular witness's testimony was exceptionally material to the verdict. So that is less a categorical rule than an empirical generalization, subject to many exceptions. Subject to at least one exception, that the district court recognized here, recognized it when denying the defendant's motion for a new trial, and I think accurately goes through the analysis to explain why Chesley's testimony here is, in fact, not the linchpin for Sombrano's conviction, and thereby distinguishing this case from other cases that the government cites and discusses in its response brief, in which a witness's testimony was, in fact, quite pivotal to securing the conviction. And so here, because there was evidence separate and apart from Agent Chesley with respect to materiality and willfulness, the confidence that we can have in the jury's verdict is not undermined by evidence of unsubstantiated allegations, non-disclosure of benefits that have been made against Agent Chesley prior to Decolitis trial. At best, those allegations would have been merely impeaching. In this case, they do not bear directly on the charge against Sombrano, and they would have had limited relevance and utility for the defendant as well. We're talking about allegations that are quite disconnected from Mr. Sombrano's case. There's no testimony in Mr. Sombrano's case from Rescio or any other cooperator, unlike the case that we had involving Robert Decolita. There's no allegation in this case that there were undisclosed benefits to testifying government witnesses. Indeed, as the defendant notes in his reply brief, he knew that Mr. Rescio had been provided benefits in the form of legal status to remain in the United States, that that had been disclosed to him. In fact, he had been part of the process, because he had been working with Mr. Rescio, the defendant had been part of the process of securing those benefits for Mr. Rescio. And, of course, defendant had ample opportunity to cross Agent Chesley throughout the trial, including on the fact that he had provided a piece of erroneous testimony to the grand jury. And so, in light of this other evidence, in light of the merely impeaching nature of the allegations that had been made against Agent Chesley, and in light of the limited utility or relevance of those allegations to the matter involving Sombrano, the district court did not abuse its discretion in denying the motion for a new trial. And similarly, the district court did not err when it denied the motions to dismiss that the defendant filed earlier in the proceedings. I believe defense counsel said that both motions to dismiss were based on, quote, Chesley's misconduct. I don't think, again, that that's an accurate representation. The first motion to dismiss alleged that the indictment was legally defective and that it did not purport to set out all of the elements of an 1001 offense. The district court dispensed with that argument properly, and that argument had nothing to do with Agent Chesley. The first motion to dismiss also discussed whether the government had alleged sufficient facts to support a conviction against Chesley, or I'm sorry, a conviction against Sombrano. The district court dispatched with that argument properly by noting that these were factual arguments for a jury, not proper for a motion to dismiss. The first motion to dismiss also argued that Sombrano's statements during that April 2019 interview should have been suppressed as coerced. That had nothing to do with any allegations of misconduct by Chesley. It turned on a legal question as to whether or not Sombrano was, in fact, in custody for purposes of a Fifth Amendment analysis during the course of that April 4th interview. When defendant says that he would have prevailed on that first motion to dismiss, I think the facts strongly indicate, or the record strongly indicates otherwise. With respect to the second motion to dismiss, that was an allegation that there had been misconduct in the grand jury tied to Chesley's testimony, Agent Chesley's testimony before the grand jury. In particular, defendant pointed to, I believe it was five alleged misrepresentations that Agent Chesley made before the grand jury. The district court properly, after looking at the record of the grand jury proceeding, concluded that, well, I think it was six alleged misrepresentations, that five of those misrepresentations simply were not borne out by the transcript. Defendant hasn't argued on appeal that, in fact, his representations of what transpired in the grand jury were accurate. And so the district court's findings there should stand. And then the remaining allegation spoke to a factual error that the government admits that Agent Chesley made in the grand jury. But as the district court found, that mistake was immaterial from a factual standpoint. Agent Chesley testified erroneously that he thought that Zambrano was being untruthful during the April interview based on his review of Resio's phone records, when, in fact, Agent Chesley had not reviewed those phone records at the time that he had testified in the grand jury. And instead, his belief that Zambrano had made false statements during the interview was based on Agent Chesley's interview of Resio. Factually, though, that doesn't matter. It's an immaterial mistake from the standpoint that Tony Chesley still had a basis to believe that Zambrano had been lying during the interview. And legally, it also doesn't matter because what, as the materiality instruction accurately told the jury, the agent's beliefs as to the falsity or truth of Zambrano's statements during the April interview have no bearing on the 1001 charge. Unless there are any further questions from the panel, the government will rest on its brief and ask that the district court's judgment be affirmed. Thank you. Thank you, counsel. Anything further, Mr. Herbert? Thank you. One point that Judge Hamilton raised about Mr. Zambrano telling Mr. Resio that he didn't have to speak with the government, I think it's important to note there that that does sound suspicious on its face, but there was ample testimony at the trial that Agent Zambrano is responsible for his confidential informant, and it's not as unusual as it sounds at first blush. With respect to the two motions dismissed, with all due respect, counsel, that the first motion dismissed was based significantly on Chesley, as well as the other points about the insufficiency of the indictment. It was based upon his violation of numerous Department of Homeland Security policies, which were— What does that have to do with the validity of an indictment, given the legal standard of Bank of Nova Scotia? That doesn't have to do— It doesn't have anything to do with the validity of an indictment. You're right, Your Honor, but it was raised in more of a Brady-Giglio issue. Which has nothing to do with the validity of an indictment. And I agree 100%, Your Honor. Finally, we've talked a lot about Chesley. There's also two other instances which we believe weren't vacating the conviction in this case. The first one with respect to the jury instruction. With respect to materiality, that was obviously a big part of our case, was that the evidence did not speak to materiality. At the close of evidence, the government's entire theory leading up to the case, or through the case, was that Zabrano knew he was guilty, and that's why he gave these evasive false answers. Based upon, and this is in the record, there was significant impeachment of other witnesses that called into question whether or not those false statements were material to that $50,000— Thank you, counsel. I'm sorry? Thank you, counsel. Thank you.